UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

RICHARD A. CLARK and JENNIFER
CLARK,

       Plaintiffs,

       v.

RIVER METALS RECYCLING, LLC and
SIERRA INTERNATIONAL MACHINERY,
LLC,

       Defendants.

Case No. 3:15-cv-00447-JPG-RJD

## MEMORANDUM AND ORDER

**J. PHIL GILBERT, DISTRICT JUDGE**

This is a products liability case involving a man who was injured when he fell off of—or, perhaps, jumped from—a car crusher. Both defendants have moved for summary judgment. (ECF Nos. 98, 145.) For the following reasons, the Court **GRANTS** both motions.

**I.    BACKGROUND**

This case is simpler than the docket sheet indicates. Plaintiff Richard Clark worked for Thornton Auto Crushing, LLC ("Thornton"). Thornton, as you might expect, crushes cars. (Richard Clark Dep. 13:5–15, ECF No. 145, Ex. G.) Thornton would then send the crushed material to defendant River Metals Recycling, LLC ("River Metals"): a salvage company. (*Id.*) Thornton used a few types of crushers to do so; one of them was an "RB6000 Logger/Baler." (*Id.* at 14:20–15:12, 88:22–89:1; Thornton Dep. 9:9–12, ECF No. 98-4.) F.LLI Tabarelli S.p.A.—an Italian company—bought a bunch of parts from irrelevant companies and assembled them in order to manufacture the baler. (Sacco Dep. 97:21–98:10, ECF No. 239-8.) Defendant Sierra International, LLC ("Sierra") then imported the baler into the United States, reassembled it to

1

some degree, mounted it on a trailer, and sold the entire machine to a company called Tri-State. (Sierra's Mot. Sum. J., ECF No. 145, Ex. B.) Later, River Metals acquired the mobile machine from Tri-State via an asset-only purchase agreement, and then leased the machine to Thornton. (Lappin Dep. 9:20–10:25, ECF No. 98-5.; River Metals's Mot. Sum. J., ECF No. 98, Ex. A.) For ease of reference, this order will refer to the combined baler/trailer as the "machine."

Richard Clark worked with the machine for about one-and-a-half to three years before his injury. (Richard Clark Dep. 25:22–26:13, 35:12–19, 50:17–51:13, ECF No. 145, Ex. G.) And the machine was not just something that he used every once in a while: he worked on the machine "pretty much every day other than Sundays," and he became so familiar with it that he "can tell you that machine blindfolded." (*Id.* at 26:24–27:3, 34:23.) This work included checking the oil, antifreeze, and hydraulic fluid as part of the machine's daily maintenance. (*Id.* at 49:10–13, 58:5–25.) But Clark's method of doing so was unusual: he would climb up the right side of the machine in a manner that involved stepping on hydraulic lines, "grab[bing] a hose to give yourself something to hold onto," and moving across a cylinder in order to reach the tanks—resulting in Clark standing on a platform about five feet above the ground. (*See generally id.* at 38–49.) This method explicitly contravened Sierra's recommended method that workers use a ladder or working platform—such as a manlift or forklift—to reach the tanks. (Torres Dep. #1 24:19–25:18, ECF No. 242-1, Ex. E.) Sierra even trained purchasers on how to perform such maintenance using a ladder, though they were obviously not in a position to train Thornton in this case given how far removed the two companies were on the distribution chain. (*Id.* at 19–24.)

Once Clark checked the tanks, he always used the same method to get down: he would face away from the trailer and jump—even though the Operator's Manual says "Do NOT jump

off the machine." (Richard Clark Dep. at 95:3–10, 116:18–117:4, ECF No. 145, Ex. G; Sierra's Mot. Sum. J., ECF No. 145, Ex. F, p. 6.) Clark even told his wife that he thought his manner of boarding and exiting the machine was dangerous. (*Id.* at 58:21–30:1.) So one day, after re-filling the hydraulic fluid using his method, Clark fell. He testified specifically:

> I climbed up, checked the fluids. I had the hydraulic buckets sitting right in between the fuel tank and the engine compartment because I'd back up -- I'd sit them up there, and I climbed up and checked all the fluids, and then when I went to get down, the last thing I remember is stepping down here on this down cylinder, and the next thing I knew, I was picking myself up off the ground. It just happened so quick.

(*Id.* at 64:8–16.) River Metals's attorney later asked about the specific reason for the fall:

> Q. Okay. So if I ask you about -- I hate to get all sounding like a lawyer, but if I asked you about the precise mechanism of why you fell, whether it was a slip or you just missed a step or whatever, any idea?
>
> A. No idea. Just no real hand hold to hang onto anything. I had my hand placed against the edge of the tank. You got about an inch lip around the edge of that tank and there's nothing -- once I stepped down, it was just over so quick, I don't know.

(*Id.* at 67:15–24.) The emergency medical records indicate that "as [Clark] was getting off the bailer (sic) apparently he slipped in hydraulic fluid," but nobody knows for certain. (ECF No. 186-1, p. 6.)

The fall shattered Clark's left elbow and he now suffers from chronic pain, so he brought suit against both River Metals and Sierra in state court on a strict products liability theory—arguing generally that the machine was defective because it did not have a fixed ladder to access the tanks or guardrails to protect someone from falling. (Compl. 1–5, ECF No. 1-1.) His wife, Jennifer, joined in the complaint on a loss of consortium theory. (*Id.* at 6–10.) River Metals later removed the complaint to federal court on diversity jurisdiction grounds, and Sierra brought a third-party contribution claim against Thornton. (Notice of Removal, ECF No. 1; Third-Party

3

Compl., ECF No. 30.) In 2017, both River Metals and Sierra brought motions for summary judgment. (ECF Nos. 98, 145.) Now, after a year of discovery disputes and extensions of time, we are here.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). In responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

B.  **Products Liability**

Since this action is rooted in diversity jurisdiction, the parties all agree that Illinois tort law governs: a federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). In Illinois, a manufacturer has a nondelegable duty to produce a product that is reasonably safe. *Hansen v. Baxter Healthcare Corp.,* 198 Ill.2d 420, 261 Ill.Dec. 744, 764 N.E.2d 35, 43 (2002); *see also* Restatement (Second) of Torts § 402A (1965). In order to recover in this type of action, a plaintiff must prove that an unreasonably dangerous condition of the product led to his injury and that the condition existed at the time it left the manufacturer's control. *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 525, 901 N.E.2d 329, 335 (2008). There are three types of unreasonably dangerous conditions: (1) a design defect; (2) a manufacturing defect: "a physical defect in the product itself"; and (3) a failure by the manufacturer to warn of dangers associated with the product. *Id.* (citing *Sollami v. Eaton*, 201 Ill.2d 1, 7, 265 Ill.Dec. 177, 772 N.E.2d 215 (2002)); *see also Show v. Ford Motor Co.,* 697 F. Supp. 2d 975, 980 (N.D. Ill. 2010) (explaining the elements of strict liability), *aff'd,* 659 F.3d 584 (7th Cir. 2011).

III. **ANALYSIS**

A.  **Jennifer Clark's Loss of Consortium Claims**

As an initial matter, Jennifer Clark has recently moved the Court to dismiss her loss of consortium claims without prejudice because she is no longer married to Richard Clark. (ECF No. 236.) Ms. Clark does not indicate under which Federal Rule of Civil Procedure she brings her motion, but it is clear that Rule 41(a)(2) applies. That Rule allows the Court to dismiss a claim at a plaintiff's request on terms that the Court considers proper. This manner of dismissal is at the sound discretion of the trial court. *Wojtas v. Capital Guardian Tr. Co.*, 477 F.3d 924,

927 (7th Cir. 2007). And here, the Court is satisfied that a dismissal of Ms. Clark's claims will not prejudice any defendant: loss of consortium claims must be joined with the principal action, *Brown v. Metzger*, 104 Ill.2d 30, 470 N.E.2d 302, 83 Ill.Dec. 344 (1984), so even if the Court dismisses Ms. Clark's claims without prejudice, she will not be able to re-file her case later on and circumvent this Court's decision regarding Mr. Clark. Accordingly, the Court will dismiss Ms. Clark's claims without prejudice to Rule 41(a)(2).

      B.      **Assumption of the Risk and Proximate Cause**

As an initial matter, Sierra is not entitled to summary judgment simply because Clark "assumed the risk" by climbing over the machine in a dangerous manner. Assumption of the risk used to be a complete bar to recovery in Illinois. *Williams v. Brown Mfg. Co.*, 45 Ill. 2d 418, 430, 261 N.E.2d 305, 312 (1970). But in 1983, the Illinois Supreme Court changed that: assumption of the risk is now a trial matter to be considered by the jury in the apportionment of damages stage, not at summary judgment. *Coney v. J.L.G. Indus., Inc.*, 97 Ill. 2d 104, 119, 454 N.E.2d 197, 204 (1983). So now is not the time to talk about that problem.

In a related vein, Sierra also argues that Clark cannot prove that the lack of a fixed latter proximately caused his injury. In support, Sierra points to Clark's deposition, where he testified that he had "no idea" why he slipped. (Richard Clark Dep. at 67:15–24.) But Sierra ignores the fact that Clark also testified that he would have used a ladder instead of jumping if one was attached to the machine. (*Id.* at 82:12–17.) That statement unequivocally demonstrates a factual dispute over whether the product's defect—here, the lack of a ladder—caused the injury in question. *Wintz by & Through Wintz v. Northrop Corp.*, 110 F.3d 508, 515 (7th Cir. 1997).

      C.      **Design Defect**

The design defect issue is the meat of this case. To prevail, Clark will have to use one of two tests to show that Sierra defectively designed the machine: (1) the consumer expectation test—which asks whether the product is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics"—or (2) the risk-utility test, which balances the magnitude of the danger against the utility of the product as designed. *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 255–59, 864 N.E.2d 249, 255–257 (2007) (citing *Lamkin v. Towner*, 138 Ill.2d 510, 528, 150 Ill.Dec. 562, 563 N.E.2d 449 (1990)). Under the consumer expectations test, Clark does not need to offer any actual evidence of consumer expectations; the jury's own experiences will suffice. *Mikolajczyk*, 327 Ill.Dec. 1, 901 N.E.2d at 352. But under the risk-utility test, Clark must offer proof of his claim, such as expert testimony on the feasibility of alternative designs, conformity with industry standards, guidelines by industry associations, legislative criteria, and more. *Calles*, 309 Ill.Dec. 383, 864 N.E.2d at 255, 260. If the two tests yield conflicting results, then risk-utility test trumps the consumer expectations test and the product is not unreasonably dangerous. *Ferraro v. Hewlett-Packard Co.*, 721 F.3d 842, 848 (7th Cir. 2013) (citing *Mikolajczyk*, 327 Ill.Dec. 1, 901 N.E.2d at 352).

Here, Clark thinks he is entitled to use the consumer expectations test because ladders and guardrails are common knowledge, and thus expert witnesses are not required. *Hernandez v. Power Const. Co.*, 73 Ill. 2d 90, 94, 382 N.E.2d 1201, 1203 (1978). Sierra, on the other hand, argues that the risk-utility test applies because the combined machine—the RB6000 baler and attached trailer—is a highly specialized piece of industrial machinery, which almost every consumer will have little to zero knowledge of. Sierra is correct: an ordinary consumer will never have purchased—let alone heard of—an RB6000 mobile baler, and there accordingly is no

7

ordinary common knowledge as to the characteristics of that machine. *Calles*, 309 Ill.Dec. 383, 864 N.E.2d at 255–257.

Clark wants the Court to break the machine down to its individual components—such as a proposed ladder or guardrail—but there is zero support for that in the case law, and Clark's cited cases are irrelevant. One of them—*Schroeder v. C. F. Braun & Co.*, 502 F.2d 235 (7th Cir. 1974)—is a case involving the Illinois Structural Work Act where a man fell off of some scaffolding, not a products liability action involving a complex piece of industrial machinery. Another—*Hernandez*, 73 Ill. 2d 90, 382 N.E.2d at 1202—is nearly identical to *Schroeder*. And the last—*O'Brien v. Coachman Indus., Inc.*, 927 F.2d 596 (4th Cir. 1991)—is an unpublished Fourth Circuit decision that interpreted Alaska products-liability law as applied to a recreational vehicle (RV): a decision which holds zero precedential value in this Court.

And even if *O'Brien* did hold any weight here, it would *hurt* Clark's case: *O'Brien* considered whether the lack of a ladder to the bunk inside of an RV constituted a design defect, and that court held that the consumer expectations test was appropriate because RVs are "not used by a specialized group of persons. Rental RVs are used by a variety of different people with no particular professional capabilities." *Id.* It is quite safe to say that industrial car crushers are in a different ballpark than rental RVs. And nevertheless, *O'Brien* is totally contrary to Clark's theory that he can break the machine into its individual components—such as a proposed ladder or guardrails—while ignoring the rest of the machine. *O'Brien* did no such thing when it analyzed the RV and the proposed ladder inside.

Since the risk-utility test applies, Clark must present some evidence that the danger of the design of the machine outweighs its utility. And since the machine is a specialized piece of industrial equipment, this evidence requires expert testimony. *See, e.g., Henry v. Panasonic*

*Factory Automation Co.*, 396 Ill. App. 3d 321, 327, 917 N.E.2d 1086, 1092 (2009) (affirming summary judgment for the defendant when the plaintiff did not present expert testimony on the design and manufacture of a "specialized piece of equipment" that required "specialized knowledge"); *Baltus v. Weaver Div. of Kidde & Co.*, 199 Ill. App. 3d 821, 834, 557 N.E.2d 580, 588 (1990) (expert opinion is necessary when the product involves "specialized knowledge or expertise outside the layman's knowledge"); *Show v. Ford Motor Co.*, 659 F.3d 584, 588 (7th Cir. 2011) ("absence of expert evidence…is fatal to plaintiffs' suit.")

### i. *The Daubert Question*

So Clark presents the testimony of his expert—Dr. James Blundell—that the machine should have had a ladder, toeboards, and guardrails. And that bare conclusion is just about all that Dr. Blundell has offered, so both Sierra and River Metals have brought a *Daubert* challenge to his testimony. Admissibility of expert testimony is governed by Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Daubert*'s progeny. In *Daubert*, the Supreme Court held that Federal Rule of Evidence 702 requires district judges to be gatekeepers for proposed scientific evidence. *Daubert*, 509 U.S. at 589; *see also General Elec. v. Joiner*, 522 U.S. 136, 142 (1997). For scientific evidence to be admissible, a district court must find it relevant and reliable; it must be scientific knowledge grounded "in the methods and procedures of science"; and it must consist of more than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589–90.

In 2000, Rule 702 evolved in response to *Daubert*. *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002). In its current form, it reads as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

Sierra and River Metals believe that the Court should strike Dr. Blundell's testimony under Rule 702 for a sea of reasons: (1) he does not know what caused Clark's fall; (2) he has no idea what areas Clark needed to access in order to perform the maintenance in question; (3) he provides no specifics, data, or even a rough sketch of his proposed alternative design; (4) he has not analyzed or tested his proposed design; (5) he had no knowledge of the operator's manual in this case; (6) he admitted that his alternative designs are "concepts based on standards," even though the standard he cited does not require the features that he advocates for; and (7) he did not know the addition of his safety equipment could even fit on the machine. Sierra points out that Dr. Blundell basically just looked at the machine, decided it needed a ladder, and did nothing more.

Clark disagrees, and refers to Sierra's motion as "frivolous" and "absurd." There are a lot of good reasons not to refer to an opposing argument this way. "The reasons include civility; the near-certainty that overstatement will only push the reader away…and that, even where the record supports an extreme modifier, 'the better practice is usually to lay out the facts and let the court reach its own conclusions.'" *Bennett v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 584, 585 (6th Cir. 2013) (quoting *Big Dipper Entm't, L.L.C. v. City of Warren*, 641 F.3d 715, 719 (6th Cir. 2011). But perhaps the biggest reason is because, as here, Sierra's argument is actually correct. *Id.* The Court has reviewed the entirety of Dr. Blundell's testimony and it does not withstand a *Daubert* challenge.

Basically, Dr. Blundell proposed that the manufacturer should have attached a fixed ladder, railings, and a toeboard to provide a safe way to access the machine in the general vicinity of the area where Clark fell. (Blundell Dep. 82:18–20, ECF No. ECF No. 145, Ex. H.) Dr. Blundell's proposal, however, is nothing but conjecture: he repeatedly demonstrated at his deposition that he does not understand how to perform daily maintenance on the machine:

> Q. All right. So you -- we've marked 7 just to identify the cylinder you're referring -- you were referring to?
>
> A. Yes, I believe that's a -- I believe that that is what I was pointing to earlier and is -- is shown as the green tube at the -- at the -- in the middle of the page.
>
> Q. Okay. And does he need to access that tube in order to check the fluids?
>
> A. I have to say I don't know the answer to that question.

(Blundell Dep. at 75:7–12.)

> Q. Do you have to be standing on that diamond platform in order to check the engine oil?
>
> A. I have to say I don't know the answer to that.

(*Id.* at 76:2–4.)

> Q. Same question with respect to the hydraulic fluid. Do you -- do you have an opinion or an understanding as to where the person has to be in order to do that?
>
> A. I'd say sitting here today I -- I don't know the specific location of the -- where the hydraulic fluid could be checked.

(*Id.* at 78:21–79:3.)

> Q. Same question again in terms of checking the coolant or antifreeze. Where does the person have to be in order to do that?
>
> A. You'd have to be most likely close to the radiator.
>
> […]

> A. But, anyway, this is the engine, and part of the engine will be the radiator. Again, I didn't go up on the thing, so I can't tell you exactly what -- what the radiator location is.

(*Id.* at 79:11–16, 82:6–9.)

> Q. Okay. And if I asked you this earlier, I apologize. Did you see where the -- the access point, for lack of a better term, to – to check the hydraulic fluid is located, the very precise plates on this machine where you look to check the level of hydraulic fluid?
>
> A. You did ask me the question, but I'll -- I'll tell you the same answer again, that I – I don't recall –
>
> Q. Okay.
>
> A. -- looking at that.

(*Id.* at 85:7–18.)

The Court is puzzled why it should admit expert testimony regarding safety mechanisms that would allegedly help with routine maintenance when that expert does not even know where that maintenance is supposed to be performed. That alone disqualifies Dr. Blundell. But there are more reasons as well. Notably, Dr. Blundell offered no calculations to support his theory, he does not provide even a rough sketch of an alternative design, and his opinion is nothing more than a "bare conclusion" that adds "nothing of value to the judicial process." *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998) (quoting *Mid–State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)). He even cited to American National Standards Institute standard A1264 1-2007 in support of his theory, but after further review, he admitted at his deposition that "I believe to make this vehicle safe [a fixed ladder] has to be there but, I mean, there's nothing in this standard that says you have to have a fixed ladder." (Blundell Dep. at 102:16–19.) Accordingly, "[n]o engineer would put such an unsupported assertion in a scholarly article…[and] we doubt that [the expert] would accept it from a student in a term

paper. Why, then, should courts pay it any heed?" *Id.* As *Daubert* and the Seventh Circuit make clear, "[n]aked opinions cannot stave off summary judgment." *Id.* The Court will strike Dr. Blundell's testimony.

Clark apparently recognizes his expert's failures too, considering he argues that he should be able to rely on the deposition testimony of Antonio Torres—Sierra's "Service Tech Manager"—as expert testimony in order stave off Sierra's motion. That argument also fails. Clark specifically relies on Torres's testimony at his second deposition, as follows:

Q. Do you know what the word "feasible" means? Do you ever use that word?

A. Yes.

Q. It means practical or possible?

A. Yes.

Q. All right. Do you believe it would have been feasible to put a ladder and a handrail between the fuel tank and the engine on the front platform.

A. I [sic] not sure that it would be feasible.

Q. But do you think it would be feasible to put it anyplace on the front platform?

A. Yes.

Q. Okay. So there's a place that could have been found for it?

A. I would think if someone was to design – yes, to design it.

Q. And it could be designed as we discussed with a folding ladder that could fold up and not even extend past the edge of the trailer platform; correct.

A. Yes.

[…]

Q. [Clark] said, "If they had a handrail and ladder, that would have took care of the whole nine yards." That would have provided a means of getting on and off the machine, would it not?

13

> A. Yes.
>
> Q. And it would have been a safe means?
>
> A. Yes.
>
> Q. Safer than climbing?
>
> A. There are other ways to do it.

(Torres Dep. #2 113:14–115:8, ECF No. 239, Ex. H.) Those "other ways" are Sierra's designed and intended ways—an external ladder, forklift, or manlift—which Torres testified about during his first deposition. (Torres Dep. #1 24:19–25:18, ECF No. 242-1, Ex. E.) Clark cannot weaponize Torres's testimony about the utility of that design into their own *Daubert* sword, considering Torres's testimony is not scientific evidence grounded in "the methods and procedures of science": it is not based on any demonstrated principles and methods; does not touch on the feasibility of any specifically drawn alternative design; and does not mention conformity with industry standards, guidelines by industry associations, legislative criteria, or anything else. FED. R. EVID. 702; *Daubert*, 509 U.S. at 589–90; *Calles*, 309 Ill.Dec. 383, 864 N.E.2d at 255, 260. His testimony—which essentially consists of responses to a number of "yes or no" questions—may be relevant and probative during cross-examination at a trial, but it is not expert *Daubert* testimony sufficient to defeat summary judgment.[1]

In sum, because Clark has brought a design defect claim against Sierra and River Metals that is unsupported by necessary expert testimony, the Court must grant summary judgment in favor of the defendants. Because this issue is dispositive, the Court declines to address River Metals's chain of distribution argument. And because there is no liability for Sierra here, their third-party contribution claim against Thornton is extinguished. 740 ILCS 100/2.

---

[1] Clark makes the exact same argument in relation to some deposition testimony of Stephen Simmons, a retired Sierra employee. (Simmons Dep. 209:1–16, ECF No. 144-1.) That argument fails for the same reasons.

### D. Failure to Warn

As a final plea, Clark argues that his products liability claims should proceed to trial because they also include a "failure to warn" theory—not just a design defect theory. Clark is wrong for a few reasons. First of all, "[i]n a strict liability case based on a failure to warn in Illinois, 'the plaintiff **must allege** and prove that defendant knew or should have known of the danger….'" *Giles v. Wyeth, Inc.*, 556 F.3d 596, 600 (7th Cir. 2009) (citing *Smith v. Eli Lilly & Co.*, 137 Ill.2d 222, 148 Ill.Dec. 22, 560 N.E.2d 324, 344 (1990)) (emphasis added). Clark's complaint does not allege this. Nowhere does it mention that Sierra "knew or should have known of the danger," and it does not contain the term "warning" anywhere. Second, and even more damaging to Clark's argument, he already represented to this Court last year that he did not allege a failure to warn theory:

> Plaintiffs' Complaint was based on strict liability. The allegations contained in the complaint were for manufacturing design and defect. Plaintiffs' Complaint did not raise a claim for failure to warn.

(ECF No. 86, p. 3.) So for Clark to turn around now and argue that he did allege a failure to warn—when both the text of his complaint and his prior filings indicate otherwise—is strange.

In the alternative, Clark asks the Court to grant him leave to amend his complaint in order to properly allege a failure to warn theory. Federal Rule of Civil Procedure 15(a)(2) governs motions to amend pleadings. The Rule instructs that the Court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Seventh Circuit has instructed that Courts should deny a leave to amend, however, when there exists "undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008).

If the Court grants Clark leave to amend his complaint at this hour, it would be a grave injustice. First, as a practical matter, it would cause extreme prejudice to the defendants: if plaintiffs could amend their complaints whenever they lost at the summary judgment stage, then that would basically be giving them a second chance at a game that they already lost. Second, this case presents a hornbook example of undue delay: Clark filed this case in 2015 and had plenty of chances to file a motion to amend his complaint. Notably, River Metals's motion for summary judgment is a year old, and Sierra's motion is eight-months old. The only reason these motions took so long to adjudicate was because of Clark's persistence to engage in additional discovery in this case. There is no reason why Clark could not have moved to amend his complaint three years ago; or two years ago; or last summer; or after they read River Metals's motion for summary judgment; or after the first supplemental discovery period; or after they read Sierra's motion for summary judgment; or after they obtained an extension of time to respond to that motion; or any other time besides now. *See, e.g., McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 687 (7th Cir. 2014) (finding undue delay when a party filed a motion to amend a counterclaim twenty months after they were first named as a party and six months after the district court dismissed the original counterclaims); *Soltys v. Costello,* 520 F.3d 737, 743 (7th Cir. 2008) (affirming a denial of a motion to amend filed 14 months after the complaint and two weeks before trial); *Alinsky v. United States*, 415 F.3d 639, 648 (7th Cir. 2005) (affirming a denial of a motion to amend that the plaintiff filed three years after the initial complaint and eight months after the plaintiff completed discovery). This case has reached its end.

## CONCLUSION

For the foregoing reasons, the Court:

- **GRANTS** River Metals Recycling, LLC's motion for summary judgment (ECF No. 98);

- **GRANTS** Sierra International Machinery, LLC's motion for summary judgment (ECF No. 145);

- **GRANTS** Jennifer Clark's motion to dismiss (ECF No. 236);

- **DISMISSES WITH PREJUDICE** Counts I & II of the complaint (the product liability claims);

- **DISMISSES WITHOUT PREJUDICE** Counts III & IV of the complaint (the loss of consortium claims);

- **DISMISSES WITH PREJUDICE** Count V of Sierra International Machinery, LLC's third-party complaint against Thornton Auto Crushing, LLC;

- **FINDS AS MOOT** the pending motion for oral argument (ECF No. 243); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:  JUNE 25, 2018**

**s/ *J. Phil Gilbert***
**J. PHIL GILBERT**
**DISTRICT JUDGE**
